**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA,

                                                REPORT AND
                                                RECOMMENDATION
                                                04-CR-6122

v.

JUSTIN DIAZ,

        Defendant.

---

### Preliminary Statement

Currently before the Court are motions by defendant Justin Diaz to suppress evidence and statements. (Docket #37). The Government has filed papers in opposition to the motions. (Docket #38). A suppression hearing was held on October 7, 2005. By Order of Judge Michael A. Telesca, dated August 17, 2004, all pretrial motions have been referred to this Court pursuant to 28 U.S.C. §636(b)(1)(A)-(B). (Docket #7). The following is my Report and Recommendation as to the defendant's suppression motions.

### Factual Background

The testimony adduced at the suppression hearing revealed that Diaz was involved in two separate encounters with the police. The first occurred on July 7, 2004 and the second on March 4, 2005. Because each encounter involves distinct facts, they will be discussed separately in this Report and Recommendation.

July 7, 2004: The incident on July 7, 2004 began at

approximately 8:20 p.m., when Rochester Police Officer Matthew Webster, while on routine patrol, observed a brown 1992 Honda driving down the street. See Transcript of October 7, 2005 Suppression Hearing [hereinafter "T"] at 49-51 (Docket #44). Officer Webster pulled the Honda over at the corner of St. Paul and Norton Streets because it matched the description and license plate of a stolen vehicle that had been reported to him earlier that day. (T at 51, 58). With the assistance of other officers, Officer Webster ordered the three occupants, including Diaz, out of the vehicle and handcuffed them. (T at 59). According to Webster, Officer Wright searched Diaz, who was the sole passenger riding in the backseat, and recovered crack-cocaine from his pocket. (T at 61-63, 66). Once the occupants were removed, Wright testified that Officer Ferro conducted a search of the vehicle and found a gun hidden under some clothing on the backseat. (T at 65-66).

Diaz was transported to the Public Safety Building where Investigator Nicholas Mazzola and his partner, Investigator May, met with him at approximately 9:15 p.m. (T at 11-12). Investigator May gave Diaz his Miranda warnings; Diaz said he understood them and agreed to speak to the officers. See Government's Exhibit 1; (T at 15, 20). Diaz told the officers that the drugs found in his possession belonged to him and that he sold drugs in order to provide for his child. (T at 21). Diaz claimed that he was walking on the street that evening when his friends

2

"Murder" and "Spaz" picked him up in the Honda. (T at 21). Diaz told the officers that he had "no idea" that there was a gun in the car. (T at 21). When the officers asked Diaz if he used the gun to protect his drugs, Diaz replied that he wanted to talk to a lawyer about that question. (T at 21).

At the point Diaz stated that he wanted to confer with counsel, the officers stopped the interview and began to leave the room. As they were exiting, Diaz stated: "Wait, wait. I want to talk." (T at 22). Diaz asked for a soda and both officers left the room to get him a drink. (T at 22-23, 35-36). When they returned with the soda, Diaz reiterated that the drugs were his but that he did not know who owned the gun. (T at 23). When the officers questioned him further about the gun, Diaz stated that he had to speak to his lawyer about that. (T at 23). Again, the officers terminated the interview and left the room. (T at 25).

After approximately five minutes of being alone, Diaz began to yell for the officers to return to the room saying that he was ready to talk and tell them what had happened. (T at 25). The officers did not return immediately, but Diaz persisted in his yelling for them to return. After ten minutes, Officer Mazzola returned to the interview room and told Diaz that he needed to "quiet down." (T at 25). Diaz responded by telling Mazzola that he "was ready to talk" and "ready to tell you what happened." (T at 25). Mazzola told Diaz: "All right. I'll give you two

3

minutes." (T at 25). During this third encounter, Diaz described the gun and told the officers that it was his. (T at 25). Diaz stated that he had been picked up on a warrant earlier that day and that Murder and Spaz came to the police station in the Honda to pick him up and that he had put the gun in the backseat. (T at 25-26). Diaz told the officers that he had bought the gun about a week ago for $300.00. (T at 26). This third interview lasted approximately fifteen minutes. (T at 26).

March 4, 2005: The encounter on March 4, 2005 began at approximately 4:30 p.m. when Rochester Police Officer Albert Weech was on routine patrol. (T at 82-83). As he approached the intersection of Saratoga and Lyell Avenue, Weech observed a vehicle in the middle of the street blocking traffic. Officer Weech testified that he observed a male standing outside the car on the passenger side who appeared to be having a conversation with the occupants of the car. (T at 83). Officer Weech noticed that when the traffic light at the intersection turned green, the car still did not move. (T at 85). As Officer Weech drove closer, he observed the man outside of the car, later identified as Diaz, to have a plastic bag in his hand. Officer Weech pulled over and stepped out of his patrol car to speak with Diaz. (T at 84-85, 91). At this point, Weech testified he observed Diaz put the bag into his left coat pocket and begin walking down Saratoga Avenue. (T at 92). Officer Weech followed him and when Diaz looked back,

the officer told him to "come here," but Diaz began to run. (T at 92).

Diaz ran left onto Lyell Avenue. Officer Weech followed him into an alley where he saw Diaz reach into his left coat pocket, stumble and then fall in the snow whereupon Officer Weech secured him. (T at 93, 100). Weech testified that Diaz fell to the ground with both of his hands beneath him. (T at 94). Officer Weech pulled Diaz's hands behind him and handcuffed him. (T at 94). As Weech rolled Diaz over, he saw a plastic bag containing what he believed was crack-cocaine lying on the ground. (T at 94-95). Officer Weech testified that the entire chase lasted approximately thirty seconds and he never lost sight of Diaz. (T at 94, 96-96).

## Discussion

1. Motion to Suppress the Cocaine Found on July 7, 2004: Diaz argues that the crack-cocaine found in his pocket on July 7, 2004 should be suppressed. According to Diaz, as a passenger in an allegedly stolen vehicle, the police were only permitted to conduct a Terry pat-down of him and they should not have searched his pockets. Based on the testimony adduced at the hearing, I disagree. Officer Webster testified that he had taken a stolen car report for the very Honda Diaz was riding in earlier that day. New York law is clear that police have probable cause to arrest the

5

passenger in a stolen car for unauthorized use of a vehicle.[1] See People v. McCaleb, 25 N.Y.2d 394, 400-401 (1969)("There is a 'fair', 'natural' and 'rational' connection between the fact that a car is being used without permission of its owner, and the presumption that those in the car, driver and passengers alike, are aware they do not have permission"); People v. Muriell, 128 A.D.2d 554, 555 (2d Dept. 1987)(defendant's claim that his "mere presence in the stolen vehicle did not provide a basis for his arrest is similarly without merit, since Penal Law § 165.05 (1) provides that such conduct constitutes the offense of unauthorized use of a vehicle in the third degree"); People v. Jerome, 100 A.D.2d 397, 400 (1st Dept. 1984)( "It was error for the hearing court to have concluded that some suspicious conduct by the defendant was necessary for his arrest apart from his being a passenger in a car the police had probable cause to believe stolen."). As the defense concedes, once the officers had probable cause to arrest Diaz, the search of his person, including his pockets, was permissible as a search incident to a lawful arrest.

2. **Motion to Suppress July 7, 2004 Post Arrest Statement**: It is undisputed that the officers gave Diaz his Miranda warnings when

---

[1] Under New York Penal Law § 165.05 a person is guilty of unauthorized use of a vehicle in the third degree if "[k]nowing that he does not have the consent of the owner, he takes, operates, exercises control over, rides in or otherwise uses a vehicle. A person who engages in any such conduct without the consent of the owner is presumed to know that he does not have such consent."

they brought him to the Public Safety Building after his arrest. Likewise, there is no dispute that Diaz told the officers that he understood his rights and that he wanted to talk. Nonetheless, Diaz contends that once he advised the officers that he wanted to speak with an attorney about the gun found in the Honda, any further questioning on that subject was in violation of his Miranda rights and his responses should be suppressed.

In Edwards v. Arizona, 451 U.S. 477, 484 (1981), the Supreme Court held that when an accused invokes his right to have counsel present during a custodial interrogation, a valid waiver of that right is not established by showing that he responded to further police-initiated questioning. "[I]f the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked." Smith v. Illinois, 469 U.S. 91, 95 (1984). Thus, "even if a conversation taking place after the accused has 'expressed his desire to deal with the police only through counsel,' is initiated by the accused, where reinterrogation follows, the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation." Oregon v. Bradshaw, 462 U.S. 1039, 1044 (1983).

I find the record clear that Diaz understood his Miranda

7

rights and indeed twice invoked his right to counsel when the officers attempted to question him about the firearm. When Diaz said that he needed to confer with his lawyer before talking about the gun, the officers immediately ceased their questioning. Indeed, the third encounter between Diaz and Officer Mazzola occurred only because Diaz spent five minutes yelling for the officers to return to the interview room. When Officer Mazzola appeared, it was Diaz who initiated further discussions and volunteered admissions about the gun. While Mazzola admittedly did not re-advise Diaz of his right to counsel, it is the "totality of the circumstances" which is the test for determining whether the purported waiver was knowing and intelligent. In this third encounter, Diaz was not interrogated, confronted with evidence, promised leniency or induced in any way to re-open the dialogue with law enforcement. He requested their presence and <u>wanted</u> to talk about the firearm. Having twice invoked his right to counsel thereby causing the cessation of questioning, Diaz certainly knew the ramifications of requesting an attorney. The hearing evidence supports a finding that prior to initiating the discussion about the firearm, Diaz had the opportunity to reflect on his situation and make a knowing and voluntary decision to engage in further discussions without the presence of an attorney. His "change of heart" was not solicited or induced by law enforcement and, under the facts presented, constituted a knowing and intelligent waiver

of his previously invoked right to consult with counsel. See North Carolina v. Butler, 441 U.S. 369, 373 (1979)(a defendant's knowing and intelligent waiver of his Miranda rights can be inferred from his course of conduct, actions and words); United States v. Terry, 702 F.2d 299, 318 (2d Cir. 1983)(where defendant's "rights were scrupulously respected at every stage, with interrogation terminated immediately upon his stating that he wanted to consult a lawyer," Court found that defendant's decision to utter certain statements constituted a knowing waiver).

3. Motion to Suppress Cocaine Seized on March 4, 2005: Diaz argues that the crack-cocaine found on the ground beneath him on March 4, 2005 should be suppressed because Officer Weech did not have probable cause to believe that a crime was being committed so as to justify his seizure of Diaz.

As the Second Circuit recently held in United States v. Swindle, 407 F.3d 562 (2d Cir.), cert. denied, __ U.S. __, 126 S.Ct. 279 (2005), a suspect is only seized for Fourth Amendment purposes when a police officer physically apprehends him. Thus, even if the officer does not have the reasonable suspicion required under Terry v. Ohio when he orders a suspect to stop, if the suspect behaves in a manner so as to give the officer reasonable suspicion between the order to stop and the actual apprehension of the suspect, the stop is lawful and the officer's initial reasons for ordering the suspect to stop are irrelevant. United States v.

Swindle, 407 F.3d at 572. See also California v. Hodari D., 499 U.S. 621, 629 (1991)(police pursuit in attempt to seize a person does not constitute a "seizure" under Fourth Amendment).

In determining whether a Terry stop is supported by reasonable suspicion, a court must take into account the totality of the circumstances viewed "through the eyes of a reasonable and cautious police officer on the scene [and] guided by his experience and training." United States v. Bayless, 201 F.3d 116, 133 (2d Cir. 2000)(citation omitted). Viewing the totality of the circumstances on March 4, 2005 through Officer Weech's eyes, I am persuaded that by the time Diaz was physically apprehended, there was, at a minimum, reasonable suspicion to support the forcible stop. See United States v. Place, 462 U.S. 696, 702 (1983)(police have the authority "to make a forcible stop of a person when the officer has reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity.").

Here, Weech observed Diaz in the middle of the street speaking to the occupants of a van that was blocking traffic at the intersection of Lyell and Saratoga Avenues, a known open-market drug-trafficking area. Upon closer examination, Weech saw Diaz had a plastic sandwich bag in his hand. Weech knew that these bags are commonly used in the drug trade to carry smaller dime-sized bags and based on his significant experience and training in drug transactions, Weech suspected this behavior to be consistent with

a drug deal. As Weech followed Diaz to investigate further, he saw Diaz look back at him and he asked Diaz to "come here." In response, Diaz ran. In Illinois v. Wardlow, 528 U.S. 119, 124 (2000), the Supreme Court addressed whether an individual's attempt to flee from police is a factor that may be considered in evaluating reasonable suspicion. The Court concluded that "[h]eadlong flight - wherever it occurs - is the consummate act of evasion: [i]t is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." Id. at 124. Given Diaz's unprovoked "headlong flight" in a high drug-trafficking area with a suspicious plastic bag on his person, Officer Weech had reasonable suspicion to pursue Diaz for further investigation. See Wardlow, 528 U.S. at 124 (officer justified in suspecting defendant was involved in criminal activity given his presence in an area of heavy narcotics trafficking plus his unprovoked flight upon noticing the police). Particularly,

> [i]n the case of narcotics trafficking, an agent's suspicion is held to be reasonable if the conduct as a whole would appear suspect to one familiar with the practices of narcotics couriers, albeit the pattern of behavior is innocuous to the untrained observer. Conduct as consistent with innocence as with guilt may form the basis for an investigative stop where there is some indication of possible illicit activity.

United States v. Villegas, 928 F.2d 512, 516 (2d Cir. 1991)(internal citations omitted).

Since Officer Weech had reasonable suspicion to forcibly

detain Diaz, the baggies of crack-cocaine found underneath Diaz in plain view were properly recovered by Weech and should be admissible against him.  See United States v. Algea, 2000 WL 92351, *5-6 (D. Conn. Jan. 5, 2000)(where officer had reasonable suspicion to conduct Terry stop, drugs found in plain view were properly seized and formed the basis for a lawful arrest).

## Conclusion

For the foregoing reasons, it is my Report and Recommendation that Justin Diaz's motions to suppress be **denied**.

**SO ORDERED.**

_____
JONATHAN W. FELDMAN
United States Magistrate Judge

Dated: January 31, 2006
       Rochester, New York

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed.R. Civ.P. 72(b) and Local Rule 72.3(a)(3).[2]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. See e.g. *Patterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the Government and the Defendant.
**SO ORDERED.**

_____
Jonathan W. Feldman
United States Magistrate Judge

Dated: January 30, 2006
Rochester, New York

---

[2] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. §3161(h)(1)(f) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the ten days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).